1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CARMEN PERES VASQUEZ, | ) | 1:10-cv-01231-SKO |
| | ) | |
| | ) | **ORDER REGARDING PLAINTIFF'S** |
| Plaintiff, | ) | **SOCIAL SECURITY COMPLAINT** |
| | ) | |
| v. | ) | (Docs. 1, 12) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

## BACKGROUND

Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying her application for disability insurance benefits ("DIB") and supplemental security income ("SSI") pursuant to Title II and Title XVI of the Social Security Act (the "Act"), respectively. 42 U.S.C. §§ 405(g); 1383(c). The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[1]

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  (Docs. 6, 8.)

**FACTUAL BACKGROUND**

Plaintiff was born in 1961, has a third-grade education, and does not speak English. (Administrative Record ("AR") 26-27.) Plaintiff began work as a poultry processor at Foster Farms in 1992, but she sustained a work-place injury on May 4, 2000. (AR 27, 457.) The injury resulted when Plaintiff lost her balance while standing on a table, but was able to "prevent a fall by grabbing a bar with [her] right hand, and grabbing the table with her left hand. She remembers that her back popped, and she says that she had burning pain up and down the spine from the head to the tailbone." (AR 457.) She sought medical care for problems in the right upper quadrant, the right shoulder area, and the right upper extremity. (AR 458.) She returned to work at Foster Farms and performed light duty for about a year. (AR 457.) She stopped work for a short time to undergo a carpal tunnel release procedure, returned to perform light duty for some period of time in 2002, but stopped working entirely in August 2002. (AR 27, 460.) Prior to her work at Foster Farms, Plaintiff worked as an almond packer and as a field worker. (AR 29.)

On December 16, 2005, Plaintiff filed applications for DIB and SSI due to pain in her neck, shoulders, lower back, and hands. (AR 30.) Plaintiff also filed a Worker's Compensation claim, for which she received medical care. Many of those medical reports were included in the medical records considered by the Social Security Administration and were discussed in the agency's decision on Plaintiff's claim.

In May 2000, Plaintiff was examined by D. Rollins, M.D., who described problems in Plaintiff's right upper quadrant, the right shoulder area, and the right upper extremity. (AR 458.)[2] X-rays of the cervical spine revealed mild degenerative changes, right shoulder x-rays demonstrated calcific tendinitis. (AR 458.) One of Dr. Rollins' therapy records described cervical and thoracic strain. (AR 458.) Dr. Rollins recommended chiropractic treatment. (AR 458.)

---

[2] For purposes of her Worker's Compensation claim, Plaintiff was examined by orthopaedist Richard G. Baker, M.D. on December 1, 2004. Dr. Baker provided a detailed history of Plaintiff's treatment records. However, not all of the medical records Dr. Baker reviewed are contained in the transcript, but the ALJ referenced and discussed some of these medical records as described by Dr. Baker. Dr. Rollins' report is not included in the record. Instead, his findings were discussed by Dr. Baker in his 2005 report. (*See* AR 456-68.)

In June 2000, Plaintiff was seen by J. Keller, D.C.  He described a "gradual onset" of Plaintiff's right neck, shoulder, upper back, and low back pain "due to repetitive arm and body motions her job requires."  (AR 231, 458.)  In July 2000, Plaintiff began seeing Christopher F. Amsden, M.D., who diagnosed Plaintiff with bilateral carpal tunnel syndrome, with the right hand more symptomatic than the left.  On September 19, 2000, Dr. Amsden performed n physical capacity evaluation of Plaintiff that reflected her functional abilities in various areas.  Dr. Amsden noted:

> The patient's functional physical capabilities at this time were compared to what level of physical activity the patient could perform in the past.
>
> My staff provided the patient with hand weights of 5, 10, 15, 20, 25, 35, and 50 pounds.  The patient was asked how much of each activity [she] could do, pertaining to the categories as summarized below, and the answers were made mostly on the patient's part but sometimes with some suggestion of questioning on the part of myself as well – as to what was consistent from one category to another and so forth.  The patient was also asked to perform the activities to assist in making estimates for results within these categories.
>
> Generally[,] I consider the patient's physical limit to be the maximum amount of a performable activity that would not likely, in the patient's estimation, exacerbate the patient's pain for over an eight-hour period of time – projecting that exceeding this limit may significantly aggravate in a pathophysiological fashion the patient[']s underlying medical condition.

(AR 483.)

Dr. Amsden assessed Plaintiff with the following as to her Material Handling Activity Capabilities (in pounds):

**Floor-to-waist lifting**:

| | |
|---|---|
| Continuous basis (two lifts/min): | Not able to lift any weight with her left hand or any weight with her right hand; |
| Frequent basis (one lift/2 min): | Not able to lift any weight with her right hand nor any weight with her left hand; |
| Infrequent basis (one lift/10 min): | Not able to lift any weight with her right or left hand; |
| Occasional basis (one lift/30 min): | Able to lift one pound with her right hand and two pounds with her left hand; was able to lift two pounds with her right hand and five pounds with her left hand rarely (one lift/hour) whereas she was able to lift 30-to-40 pounds prior to 5/4/00 on a "rarely" basis. |

**Waist-to-shoulder lifting**:

| | |
|---|---|
| Continuous basis: | Not able to lift any weight with her right or left hand; |

| | |
|---|---|
| Frequent basis: | Not able to lift any weight with her right or left hand; |
| Infrequent basis: | Able to perform this activity but without weight with her right hand, able to do it with two pounds in her left hand; |
| Occasionally: | Able to lift one pound with her right and five pounds with her left hand; |
| Rarely: | Able to lift two pounds with her right hand and seven pounds with her left hand. |

**Lifting from shoulder to overhead**:

| | |
|---|---|
| Continuous basis: | Not able to perform this activity with her right or left hand even without weight; |
| Frequently: | Not able to perform this activity without weight with her right hand and was able to perform it with one pound with her left hand; |
| Infrequently: | Able to perform this activity only without weight with her right hand and with two pounds in her left hand; |
| Occasionally: | Able to perform this activity with one pound with her right hand and three pounds with her left hand; |
| Rarely: | Able to lift two pounds with her right hand and four pounds with her left hand, whereas she was able to lift ten pounds rarely before 5/4/00. |

**Carrying**:

| | |
|---|---|
| Continuous basis: | Able to perform this activity only without weights; |
| Frequently: | Able to perform this activity with two pounds; |
| Infrequently: | Able to perform this activity with five pounds; |
| Occasionally: | Able to carry eight pounds; |
| Rarely: | Able to carry ten pounds whereas prior to 5/4/01 she was able to carry 25 pounds. |

(AR 484.)

Dr. Amsden also assessed the following with respect to Plaintiff's Material Handling Activity Capabilities (in pounds):

Overhead reaching: Before 5/04/00, she was able to perform this activity for 1 minute requiring a 30-second break before repetition of this activity. Currently able to reach overhead on a continuous basis for 15 seconds but required a two-to-five minute break between each repetition of this activity.

Forward Reaching: Before 5/04/00, able to forward reach for four minutes on a continuous basis and required a one-to-two minute break between each repetition. Currently, able to perform this activity for 20 seconds and required a two-to-five minute break between each repetition.

4

<u>Bending</u>: Before 5/04/00, able to bend for 30 minutes on a continuous basis and required a 15-minute break between each repetition. Currently, able to bend on a continuous basis for 15 seconds, and required a 5-to-10 minute break between each repetition.

<u>Twisting</u>: Before 5/04/00, she was able to twist 240 times each way on a continuous basis and required a 15-minute break between each repetition. Currently, she was able to twist twice each way and needed a two-to-five minute break before repetition of this activity.

<u>Squatting</u>: Before 5/04/00, she was able to squat for 10 minutes on a continuous basis and required a 10-minute break before being able to repeat this activity. Currently, she was able to squat on a continuous basis for 10 seconds and required a two-to-five minute break before being able to repeat this activity.

<u>Walking</u>: Prior to 5/04/00, she was able to walk 30 minutes on a continuous basis and required a 15-minute break before being able to repeat this activity. Currently, she was able to walk for one minute on a continuous basis and required a two-to-five minute break before she could repeat this activity.

<u>Sitting</u>: Before 5/04/00, she was able to sit for two hours on a continuous basis and required a 15-to-20 minute break before she was able to repeat this activity. Currently, she was able to sit for 30-to-60 minutes on a continuous basis and required a five-minute break before she was able to repeat this activity.

<u>Standing</u>: Prior to 5/04/00, she was able to stand continuously for two hours and required a 15-minute break before she could repeat this activity. Currently, she was able to stand for 15 minutes on a continuous basis and needed a five-minute break before she could repeat this activity.

<u>Pushing/pulling</u>: Prior to 5/04/00, she was able to push/pull for 60 minutes on a continuous basis and required a 10-minute break before she was able to repeat this activity. Currently, she was able to push/pull on a continuous basis for 30 seconds and required a two-to-five minute break before she could repeat this activity.

(AR 483-85.)

In March 2001, Plaintiff was examined by K. Koskella, M.D., for purposes of Worker's Compensation.[3] Dr. Koskella diagnosed possible bilateral carpal tunnel syndromes, and chronic cervical, thoracic, and lumbar sprains. (AR 458.) Plaintiff was referred to W. Kinizie, M.D., who diagnosed bilateral carpal tunnel syndromes, greater on the right. (AR 216.) Right carpal tunnel release surgery was performed in January 2002. (AR 213-15, 458.)

[3] Dr. Koskella's report was not included in the record. Instead, Dr. Koskella's findings were discussed by Dr. Baker in his 2005 report. (*See* AR 458.)

Plaintiff was evaluated by J. Stark, M.D. in December 2002.  (*See* AR 459.)[3]  Dr. Stark diagnosed bilateral carpal tunnel syndromes, neck and back conditions, and psychosocial factors. (AR 459.)  Plaintiff's neck and upper extremity conditions were thought to be reflective of cumulative trauma, and Dr. Stark opined that the conditions were permanent and stationary.  (AR 459.)  With regard to the cervical spine, Dr. Stark opined that Plaintiff was precluded from very heavy lifting, prolonged maintenance of the neck in a single position, and prolonged or repetitive upward gaze (as necessary for over-shoulder  work).  (AR 459.)  With respect to Plaintiff's right wrist, Dr. Stark found a 50% loss of capacity for repetitive hand activities such as data input and a 25% loss of capacity for gripping, pushing, pulling, and carrying.  (AR 459.)

Plaintiff's conditions were evaluated by I. Jercinovich, M.D., in March 2004. (AR 459.)  Dr. Jercinovich diagnosed neck, back, and right upper extremity conditions that he opined were permanent and stationary. (AR 459.)  With respect to Plaintiff's spine, Dr. Jercinovich found that Plaintiff was precluded from heavy lifting, repetitive bending, and stooping. (AR 459.) With respect to the right upper extremity, Dr. Jercinovich found Plaintiff was preluded from forceful grasping or torquing.  Both Dr. Jercinovich and Dr. Stark remarked on non-physiologic factors.  (AR 459.)

As to Dr. Baker's own examination reports as set forth in February 2005, Plaintiff reported tenderness in her right and left cervical musculature, the cervical spine, and the right and left trapezial regions as well as tenderness diffusely in Plaintiff's entire spine.  (AR 462.)  The range of motion in Plaintiff's neck was deemed to be 75% of normal in all directions, but the range of motion in her shoulders and upper extremity joints was normal.  Both Plaintiff's wrists and hands were tender, as were her bilateral forearms, but there was no clear swelling in the upper extremities.  (AR 462.)  Plaintiff's grip strength testing resulted in "relatively low readings" that Dr. Baker felt "probably reflect[ed] submaximal effort."  (AR 463.)  Plaintiff walked slowly, but without a limp. (AR 463.)  Plaintiff's range of motion in her back was deemed to be 60% of normal in all planes, but the range of motion in Plaintiff's lower extremity was normal.  (AR 463.)  Based upon magnetic

---

[3] As with Dr. Koskella, the reports of Drs. Stark and Jercinovich were not included in the record on appeal. Rather, Drs. Stark and Jercinovich's reports were discussed by Dr. Baker and, in turn, by the ALJ in his decision. (*See* AR 15, 459.)

resonance imaging ("MRI") and X-ray reports, Dr. Baker diagnosed cervical, thoracic, lumbar strain; bilateral upper extremity overuse syndromes; right carpal tunnel syndrome and possible mild left carpal tunnel syndrome, status post right carpal tunnel release; and non-organic factors affecting Plaintiff's physical conditions. (AR 464.) Dr. Baker described his findings as follows, in relevant part:

> The examinee has continuing neck and back pain, and she also describes radiating symptomatology. Diagnostic workup, however, does not reveal significant disc pathology, stenosis, or even significant degenerative changes in the spine. Electrodiagnostic testing has not disclosed upper or lower extremity radiculopathy. The current physical examination does not confirm radicular impairment or positive tension signs, and my examination contains non-physiologic indicators. This appears to be reasonably consistent with Drs. Stark and Jercinovich.

> In my opinion, the examinee's spinal (all areas collectively) and radiating symptomatology should be characterized as Intermittent and Moderate with heavy lifting.

> . . .

> Considering all the information, it is my opinion that [Plaintiff] has spinal permanent partial disability, encompassing the neck and back collectively, such that she should be precluded from heavy Lifting.

> . . .

> In my opinion, right upper extremity symptomatology should be characterized as Intermittent and Moderate with repetitive grasping, heavy lifting, and other comparable activities. Left upper extremity symptomatology should be characterized as Intermittent and Moderate with repetitive forceful grasping, very heavy lifting, and other comparable activities.

> . . .

> Based on all information, it is my opinion that right upper extremity permanent partial disability is best described by a 50% reduction in capacity for Lifting, Grasping, Pushing/Pulling, and other comparable activities; and left upper extremity permanent disability is best described by a 25% reduction in capacity for Lifting, Grasping, Pushing/Pulling, and other comparable activities.

(AR 465-66.)

As to future medical care, Dr. Baker did not believe Plaintiff required a spinal surgical consultation or that she has surgical spinal conditions. (AR 467.) Dr. Baker recommended six to ten sessions with a psychologist well-versed in pain syndromes, which he felt would be helpful in assisting Plaintiff to better adjust to her conditions. (AR 467.)

On April 10, 2006, M. O. Nawar, M.D., conducted a review of Plaintiff's medical records and completed a physical RFC assessment. (AR 391-98.) He opined that Plaintiff retained the capacity to lift and carry 20 pounds occasionally and 10 pounds frequently; the ability to stand and walk approximately six hours in an eight-hour workday; sit for a total of six hours in an eight-hour workday; and had no postural limitations other than a limited ability to reach overhead. (AR 392-94.)

On December 10, 2006, Plaintiff was examined by orthopedist, Dr. Rosalinda Serrano, a state agency physician. (AR 399-404.) Plaintiff reported to Dr. Serrano that she had bilateral carpal tunnel syndrome and had undergone unsuccessful right-hand surgery in 2002. (AR 400.) She explained that she had refused surgery on the left hand due to lack of success on the right, and she wore a brace on the left hand. (AR 400.) Plaintiff also reported that she suffered neck pain that radiates to both her shoulders, low-back pain which radiates to both her hips, and left-shoulder problems. (AR 400-01.) Dr. Serrano reported Plaintiff had pain and tenderness in bilateral L5-S1, she had difficulty turning her neck to the left and the right, she experienced pain and tenderness in C3-T1, pain and tenderness of right wrist and hand, and pain and tenderness of the left and right elbows and bilateral shoulders. (AR 403.)

Dr. Serrano diagnosed sprain/strain of the LS-spine; degenerative joint disease of the LS-spine; bilateral shoulder sprain/strain; history of prior carpal tunnel release, right; sprain/strain cervical spine; and bilateral carpal tunnel syndrome by history. (AR 403.) She opined to the following restrictions:

> The number of hours claimant could be expected to stand and walk would be two hours because of degenerative joint disease in LS-spine. The number of hours the claimant could be expected to sit would be less than six hours. She does not need an assistive device. Lifting and carrying should be restricted to 10 pounds occasionally because of bilateral shoulder, bilateral elbow and bilateral elbow wrist and hand pain, as well as neck pain. Because of low back pain, she should avoid bending, stooping, crouching, crawling and kneeling. Because of bilateral carpal tunnel syndrome and previous right carpal tunnel release, she should avoid reaching, handling, feeling, grasping, and fingering. Because she used to work as a chicken bagger, this requires repetitive use of both hands. She should not do this anymore. She should not be using her hands for twisting, grasping, or torquing.

(AR 404.)

On January 6, 2007, Plaintiff underwent a comprehensive psychiatric evaluation conducted by James Scaramozzino, Ph.D. (AR 405-10.) Plaintiff explained to Dr. Scaramozzino that she has experienced ongoing chronic pain since she was injured at her job in May 2000. (AR 406.) She reported that her pain averages between an eight or a nine on a scale of one to ten, ten being the most painful. (AR 406.) She explained that the medication she used to treat her chronic pain caused her drowsiness and a loss of concentration. (AR 406.) She described herself as sad because she could not work as she did previously which caused financial difficulty for her household. (AR 406.) Dr. Scaramozzino found that Plaintiff answered questions in an open and honest manner with no evidence of symptom exaggeration or inconsistencies within the evaluation process. (AR 408-09.) He opined that her limitations appeared due to reported medical problems that are generating psychological side effects primarily due to the impact on her life and the lives of her family members, particularly as it related to financial difficulty. (AR 409.) He opined that she had good ability in almost all mental functional aspects. (AR 409.)

On March 17, 2007, A. M. Khong, M.D., reviewed Plaintiff's medical records. (AR 412.) In Dr. Khong's report, he expressed disagreement with Dr. Serrano's assessment. (AR 412.) In particular, Dr. Khong noted that the 2004 MRIs of Plaintiff's lumbar and cervical spines were normal, yet Dr. Serrano determined that Plaintiff was restricted to two hours a day of standing and walking due to degenerative changes in the lumbar spine. (AR 412.) Dr. Khong disputed this finding because no abnormalities were found on the MRI of the lumbar spine. (AR 412.) There were also indications in the medical records that Plaintiff was not putting forth full effort in strength testing and that her subjective statements regarding her symptoms have been excessive throughout the record. For example, while Plaintiff reported a spread of pain to "the contralateral side up to her neck," there was no objective evidence of cervical radiculopathy. (AR 412.) Additionally, there were no objective findings to suggest "a regional complex pain syndrome to account for the [claimant's] ongoing [subjective complaints of] pain." (AR 412.)

On April 6, 2007, pursuant to the review of Plaintiff's medical records discussed above, Dr. Khong opined that Plaintiff could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds; stand and walk for approximately six hours in an eight-hour workday; sit for approximately

1   six hours in an eight-hour workday; frequently climb, stoop, and crouch; occasionally balance, kneel,

2   crouch, and crawl; and had no manipulative limitations such that she had an unlimited ability to

3   reach in all directions including overhead, and to handle, finger, and feel.  (AR 416.)

4       On September 13, 2007, Dr. Baker, who examined Plaintiff as an "Agreed Medical

5   Evaluator" in December 2004 (and issued reports in February and May 2005) for purposes of

6   Plaintiff's Worker's Compensation claim, again examined Plaintiff and assessed the medical records.

7   (AR 448-55.)  He expressed some skepticism regarding Plaintiff's subjective complaints of pain and

8   weakness.  (*See, e.g.,* AR 450 ("Ms. Vasquez reports that she can lift 3 pounds, walk short distances,

9   stand 10 minutes, sit 15 minutes (she sat considerably longer while I took her history), and drive 15

10  to 20 minutes."); 452 ("Motion of the cervical spine is observed to be greater when Ms. Vasquez is

11  distracted."); 452 ("although the fingers are somewhat stiff (seemingly)") 453 ("Given the very low

12  readings (even lower than the 2004 examination), and other physical findings at this time, I consider

13  it highly likely that the grip testing is invalid due to submaximal effort.").)  Dr. Baker noted

14  additional MRIs and X-rays had been requested, but the results were not yet available.  (AR 454.)

15  He diagnosed Plaintiff with cervical, thoracic, and lumbar strain; bilateral carpal tunnel syndromes

16  with possible bilateral cubital tunnel syndromes; and probable non-organic factors affecting physical

17  conditions.  (AR 454.)  Dr. Baker did not advise injections or consider Ms. Vasquez as a suitable

18  candidate for a spinal cord simulator, and he further opined that there were no surgical indications.

19  (AR 455.)

20      On September 26, 2007, an X-ray of Plaintiff's left shoulder was completed.  (AR 441.)  It

21  was noted that the acromioclavicular joint was "unremarkable," the glenohumeral joint was

22  "normal," but there were calcifications "noted within the subacromial space consistent with calcific

23  tendinosis." (AR 441.)  The findings were interpreted as "consistent with calcific tendinosis and

24  degenerative changes in the acromioclavicular joint."  (AR 441.)  An X-ray of Plaintiff's right

25  shoulder was also taken and indicated degenerative changes of the acromioclavicular joint with no

26  spurring of the distal clavicle.  (AR 442.)  The findings were interpreted as "consistent with calcific

27  tendinosis of the rotator cuff."  (AR 442.)  A left-wrist radiograph was found to be "unremarkable."

28  (AR 443.)

Also on September 26, 2007, MRIs of Plaintiff's lumbar and cervical spines were taken. (AR 444-47.) Dr. Ronald J. Friedman interpreted the lumbar spine MRI results as showing "L3-L4 2-3 mm disk protrusion eccentric toward the right as seen on the sagittal images. No nerve root encroachment is seen. L5-S1, 2-3 mm central disk bulge encroaching on the epidural fat and abutting the thecal sac." (AR 445.) The cervical lumbar spine MRI images were interpreted by Dr. Friedman as showing "[m]ild degenerative bone and disk changes C3-C5. Central disk bulges at C3-C4, C4-C5 and C5-C6 as described. Mild reversal of the normal cervical lordosis at C4-C5." (AR 447.)

On September 27, 2007, Plaintiff underwent an electromyography. (AR 438.) The results indicated borderline right median sensory distal latencies, which were considered consistent with a history of right-sided carpal tunnel syndrome and a surgical release. (AR 439.) There was no evidence of left median neuropathy at the wrist or an ulnar neuropathy bilaterally. (AR 439.) "The needle electrode examination was normal and did not demonstrate evidence of cervical radiculopathy bilaterally. (AR 439.)

On November 6, 2007, Dr. Baker reviewed the MRI and X-ray findings and supplemented his September 2007 opinion. (AR 435-37.) Dr. Baker found that "in the interval since testing in 2004, Ms. Vasquez has developed degenerative pathology in the cervical spine and in the lumbar spine. There is no indication of overt disc herniation, nerve root compression, cord compression, etc." (AR 436.) Further, Dr. Baker explained that, "[w]hen I examined Ms. Vasquez in September 2007, the examinee again reported shoulder girdle pain, and I found diffuse tenderness in the shoulders . . . [the recent X-ray results] confirm that the examinee has calcific tendinitis." (AR 436.) Dr. Baker found that this "would be an adequate explanation for current shoulder pain . . . ." (AR 436.) Dr. Baker concluded that his review of the diagnostic testing "does not cause me to change the opinions and recommendations in my 9/17/07 report. I would not advise injections or a spinal cord simulator, and I do not find surgical indications." (AR 436.)

Dr. Amsden examined Plaintiff on December 26, 2007. He requested that Dr. Baker's most recent evaluation of Plaintiff be made available to him. (AR 477.) He also indicated that he would follow-up with Plaintiff. (AR 480.)

On March 17, 2008, Dr. Amsden provided an assessment of Plaintiff's functional capacity. (AR 490-92.) He opined that Plaintiff could lift no more than 10 pounds frequently or occasionally. (AR 490.)  He also found that Plaintiff's ability to stand and walk during a normal eight-hour workday was limited to two hours.  (AR 490.)  He also opined that Plaintiff should never reach, handle, figure, climb, stoop, kneel, crouch, or crawl.  (AR 491.)  These postural limitations were assessed on the basis of Plaintiff's complaints of pain, the swelling and pain in her wrists that occurred with minor activity, and the inability to kneel was predicated on Plaintiff's complaints of lower back pain and unsteadiness.  (AR 491.)

**B.   Administrative Proceedings**

The Commissioner denied Plaintiff's application initially and again on reconsideration; consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 45-52, 53-64, 70-80, 84.)

**1.     Plaintiff's Testimony**

At the time of the hearing, Plaintiff reported that she had been seeing Dr. Amsden for approximately six years for care related to her neck, shoulder, lower-back, and hand pain. (AR 30.) Her prescription medications do lower the pain she experiences, but they cause her dizziness for approximately three hours after ingestion. (AR 33.)

Plaintiff also described the activities in which she engages in a typical day.  (AR 34.)   She rises at approximately 7:00 a.m., wakes her daughter to get ready for school, and then showers after her daughter leaves for school. (AR 34.) She takes her medication after breakfast at approximately 9:00 a.m., and then lies down until the dizziness subsides.  (AR 34.)  She rises at approximately 11:00 a.m. and walks in the yard, washes dishes as needed, and picks her daughter up from school or after-school sports activities. (AR 34.) In the evening after her husband is home, Plaintiff spends time cooking and eating dinner with her family, and then takes another dose of her medication.  (AR 35.)  She performs stretching exercises for her back as needed; if she uses both hands, she can lift and carry four to five pounds; she can walk approximately 15 minutes, stand for approximately 10 minutes; and estimated she could be on her feet for about three hours in an eight-hour workday. (AR

36-37.)  She believes that the pain in her shoulders, neck, lower-back, and hands prevents her from working.  (AR 37.)

### 2. Vocational Expert Testimony

A vocational expert ("VE") testified that Plaintiff's past relevant work at Foster Farms was characterized as an agricultural produce packer which is defined by the Dictionary of Occupational Titles ("DOT") as unskilled, medium work, but was considered heavy as performed by Plaintiff. (AR 41.)  Her past work as an almond packer was categorized as "fruit harvest worker," and her work in the fields was categorized as "weeder/thinner." (AR 41.)  Both of these jobs are defined by the DOT as medium, unskilled work.  (AR 41.)

The VE testified that a hypothetical person of Plaintiff's age with her educational level and past work experience who retained the ability to lift and carry 20 pounds occasionally and 10 pounds frequently; could stand, walk, and sit six hours each in an eight-hour workday; occasionally climb ropes, ladders, and scaffolds; occasionally stoop, crouch, and crawl; but must avoid overhead work, could not perform any of Plaintiff's past relevant work.  (AR 41.)  However, such a hypothetical person could perform work in the national economy which included work as a "bottling line attendant," "patch worker," and "raw shellfish preparer." (AR 42.)

A second hypothetical person of Plaintiff's age and with her educational level and work experience who retained the ability to lift and carry four to five pounds maximum; to stand for a total of three hours; to walk for a total of 15 minutes at one time; and who suffers dizzy and sleepy episodes for approximately three hours after taking medications, could not perform Plaintiff's past relevant work nor could such a person perform any other jobs in the national economy.  (AR 42-43.)

### 3. ALJ's Decision

On July 23, 2008, the ALJ issued a decision, finding Plaintiff not disabled since May 4, 2000.  (AR 12-21.)  Specifically, the ALJ found that Plaintiff (1) had not engaged in substantial gainful activity since the alleged onset date of June 1, 2001; (2) has impairments that are considered "severe" based on the requirements in the Code of Federal Regulations; (3) does not have an impairment or a combination of impairments that meets or equals one of the impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) could not perform her past relevant work; but (5) could perform jobs

that exist in significant numbers in the national economy. (AR 17-21.) Plaintiff sought review of this decision before the Appeals Council. (AR 4.) On May 4, 2010, the Appeals Council denied review. (AR 1-3.) Therefore, the ALJ's decision became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

## C.   Plaintiff's Contentions on Appeal

On July 7, 2010, Plaintiff filed a complaint before this Court seeking review of the ALJ's decision. Plaintiff argues that the ALJ failed to provide legally sufficient reasons to reject the opinions of Drs. Amsden and Serrano; failed to properly weigh the credibility of Plaintiff's statements as well as those of a lay witness; failed to credit the VE's response to a hypothetical that adequately described Plaintiff's limitations; and failed to question the VE whether his testimony was consistent with the DOT.

## SCOPE OF REVIEW

The ALJ's decision denying benefits "will be disturbed only if that decision is not supported by substantial evidence or it is based upon legal error." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999). In reviewing the Commissioner's decision, the Court may not substitute its judgment for that of the Commissioner. *Macri v. Chater*, 93 F.3d 540, 543 (9th Cir. 1996). Instead, the Court must determine whether the Commissioner applied the proper legal standards and whether substantial evidence exists in the record to support the Commissioner's findings. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).

"Substantial evidence is more than a mere scintilla but less than a preponderance." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 229 (1938)). The Court "must consider the entire record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion, and may not affirm simply by isolating a specific quantum of supporting evidence." *Lingenfelter v. Astrue*, 504 F.3d 1028, 1035 (9th Cir. 2007) (citation and internal quotation marks omitted).

## APPLICABLE LAW

An individual is considered disabled for purposes of disability benefits if he is unable to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted, or can be expected to last, for a continuous period of not less than twelve months.   42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also Barnhart v. Thomas*, 540 U.S. 20, 23 (2003).   The impairment or impairments must result from anatomical, physiological, or psychological abnormalities that are demonstrable by medically accepted clinical and laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial, gainful work that exists in the national economy.   42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The regulations provide that the ALJ must undertake a specific five-step sequential analysis in the process of evaluating a disability.   In the First Step, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity.   20 C.F.R. §§ 404.1520(b), 416.920(b). If not, in the Second Step, the ALJ must determine whether the claimant has a severe impairment or a combination of impairments significantly limiting her from performing basic work activities. *Id.* §§ 404.1520(c), 416.920(c).   If so, in the Third Step, the ALJ must determine whether the claimant has a severe impairment or combination of impairments that meets or equals the requirements of the Listing of Impairments ("Listing"), 20 C.F.R. 404, Subpart P, App. 1.   *Id.* §§ 404.1520(d), 416.920(d).   If not, in the Fourth Step, the ALJ must determine whether the claimant has sufficient residual functional capacity despite the impairment or various limitations to perform her past work.   *Id.* §§ 404.1520(f), 416.920(f).   If not, in the Fifth Step, the burden shifts to the Commissioner to show that the claimant can perform other work that exists in significant numbers in the national economy.   *Id.* §§ 404.1520(g), 416.920(g).   If a claimant is found to be disabled or not disabled at any step in the sequence, there is no need to consider subsequent steps.   *Tackett v. Apfel*, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. §§ 404.1520, 416.920.

# DISCUSSION

## A.    Weight of the Medical Evidence

Plaintiff asserts that the ALJ erred by failing to provide specific and legitimate reasons for discounting the opinion of treating physician Dr. Amsden and examining physician Dr. Serrano. (Doc. 12, 28-32.)  Dr. Amsden determined that Plaintiff could lift only two pounds with her right hand and one pound with her left hand (AR 483-84, 490), and Dr. Serrano opined Plaintiff could not stand more than two hours in an eight-hour workday (AR 404).  Plaintiff contends that, if these limitations were properly credited, the ALJ would have been required to find Plaintiff disabled. (Doc. 12, 32:3-9.)

The Commissioner contends that the ALJ properly relied on the opinions of Drs. Nawar and Khong who determined that Plaintiff retained the ability to perform restricted, light work.  (Doc. 16, 7:13-8:4.)  The Commissioner argues that the ALJ appropriately considered these opinions as most consistent with the objective medical evidence in the record.  Further, the ALJ provided legally sufficient reasons to reject the opinions of Drs. Amsden and Serrano.  (Doc. 16, 8:5-9:16.)  With regard to Dr. Amsden, the ALJ properly found that Dr. Amsden's opinions were inconsistent with the medical record and Dr. Amsden appeared to have accepted Plaintiff's subjective complaints and taken the position of "advocate" for Plaintiff.  (Doc. 16, 8:25-9:16.)  With regard to Dr. Serrano, the ALJ adopted Dr. Khong's critique of Dr. Serrano's opinion – that Dr. Serrano's opinion was not supported by the evidence or record, and was supported only by Plaintiff's subjective complaints which were found not entirely credible.  (Doc. 16, 8:5-24.)

### 1.    Legal Standard

The medical opinions of three types of medical sources are recognized in Social Security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (non-examining physicians)."  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).  Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  *Id.*  Where a treating or examining physician's opinion is uncontradicted by

1   another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the

2   treating physician's ultimate conclusions. *Id.* If the treating or examining doctor's medical opinion

3   is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons

4   for rejecting that medical opinion, and those reasons must be supported by substantial evidence in

5   the record. *Id.* at 830-31; *accord Valentine v. Comm'r Soc. Sec. Admin.*, 574 F.3d 685, 692 (9th Cir.

6   2009). The ALJ can meet this burden by setting out a detailed and thorough summary of the facts

7   and conflicting clinical evidence, stating his interpretation thereof, and making findings. *Tommasetti*

8   *v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

9          **2.     Dr. Amsden's Opinions of Plaintiff's Functional Capacity**

10         The ALJ considered Dr. Amsden's March 2008 opinion that Plaintiff is able to lift and carry

11  two pounds on the right and one pound on the left; that she is able to stand and walk two hours in

12  an eight-hour workday; if she walks fifteen minutes she needs a ten minute break; she is able to sit

13  thirty minutes in an eight-hour day; and she is precluded from climbing, stooping, kneeling,

14  crouching, crawling, handling, and fingering. (AR 17.) The ALJ gave this opinion little weight

15  because it was not consistent with the medical record as a whole. (AR 17.) The ALJ noted that

16  "objective laboratory reports and X-rays in this matter are not consistent with the extremely reduced

17  level of activity described by the doctor." The ALJ further reasoned that, "[o]n the whole, the doctor

18  appears to have accepted the claimant's subjective complaints, and the above-noted opinions appear

19  reflective of a position of 'advocate' for the patient." (AR 17.)

20         **a.     The ALJ's Rejection of Dr. Amsden's Opinion As Predicated Solely on
               Subjective Testimony and Because of Evidence of Bias**

21

22         Plaintiff asserts that Dr. Amsden's opinion was not predicated entirely on her subjective

23  complaints; rather, Dr. Amsden formulated his opinions on clinical observations noted over a long

24  period of time, functional testing, objective radiological evidence, as well as Plaintiff's subjective

25  complaints. Thus, under *Ryan v. Comm'r*, 528 F.3d 1194 (9th Cir. 2008), Plaintiff contends that the

26  ALJ's rejection of Dr. Amsden's opinion because it relied on Plaintiff's subjective complaints was

27  error. (Doc. 12, 29:21-30:23.) Further, Plaintiff argues that there is no evidence in the record to

28  support the ALJ's "unfounded accusation that Dr. Amsden acted as an 'advocate' for Ms. Vasquez."

1  (Doc. 12, 30:24-25.)  Finally, Plaintiff asserts that the ALJ gave controlling weight to the opinions

2  of the non-examining state agency physicians, but the opinions of those physicians cannot constitute

3  substantial evidence to discredit the treating and examining opinions.  (Doc. 12, 31:5-32:2.)

4       The Commissioner contends that, because the degree of limitation Dr. Amsden opined was

5  inconsistent with the medical findings and thus appeared more heavily predicated on Plaintiff's

6  subjective complaints, this was evidence of advocacy.  The Commissioner asserts that Plaintiff's lack

7  of credibility was a valid reason to discount Dr. Amsden's opinion, which appeared based solely on

8  Plaintiff's subjective complaints.  Moreover, the ALJ properly determined that Dr. Amsden's report

9  was biased as it appeared to advocate on behalf of Plaintiff.

10      The ALJ rejected Dr. Amsden's opinion, in part, because it appeared heavily based on

11  Plaintiff's subjective complaints, which the ALJ interpreted as indicative of bias on the part of Dr.

12  Amsden.  (AR 17 ("On the whole, the doctor appears to have accepted the claimant's subjective

13  complaints, and the above-noted opinions appear reflective of a position of 'advocate' for the

14  patient.").)  The Court finds a lack of support for the proposition that Dr. Amsden's opinion of

15  Plaintiff's functional capacity was based solely on an uncritical acceptance of Plaintiff's subjective

16  complaints.  Dr. Amsden examined Plaintiff every two weeks for approximately eight (8) years.  (AR

17  235-390, 492.)  During that time, he performed objective testing and reviewed Plaintiff's multiple

18  X-ray and MRI reports.  In his 2008 report, Dr. Amsden noted that his opinions regarding Plaintiff's

19  functional capacity were based on MRI reports, the treatment Plaintiff had received in the past, his

20  direct observations of her conditions and the physical examinations he performed, along with

21  Plaintiff's subjective reports of her pain and limitations.  (AR 492.)  The fact that Dr. Amsden

22  considered Plaintiff's subjective complaints of pain in combination with other objective medical

23  evidence and his own observations of her condition is not substantial evidence of bias or "advocacy."

24      Additionally, the fact that Dr. Amsden considered Plaintiff's subjective testimony, even

25  though the ALJ found Plaintiff's testimony regarding her limitations not entirely credible, is legally

26  insufficient to discredit Dr. Amsden.  As noted above, Dr. Amsden stated his opinion was based on

27  objective testing, his observations of claimant over the course of their eight-year treating

28  relationship, in addition to Plaintiff's subjective testimony regarding her limitations.  Thus, the ALJ's

doubts about the claimant's credibility do not justify the rejection of Dr. Amsden's opinion. *Ryan,* 528 F.3d at 1199-1200 (ALJ may not reject physician's opinion that is based in part on claimant's subjective complaints "where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations").

The material issue in this case does not involve an emotional condition that may be diagnosed and evaluated almost entirely on the claimant's self-reported symptoms; in other words, Dr. Amsden was not without objective medical evidence to guide his evaluation of Plaintiff's condition. Nor is this a case where the claimant provided the treating physician with *demonstrably* false statements about the severity of her condition that, in turn, inescapably corrupted the reliability of the physician's findings and observations.[4]   If there were evidence that Plaintiff was participating in competitive body-building, for example, but reported to Dr. Amsden that she could not lift more than 5 pounds, this type of credibility evidence might well render Dr. Amsden's opinion a nullity, despite any objective evidence supporting her complaints of pain and limitation that he considered. This, however, is not the situation here.

Dr. Amsden's opinion about Plaintiff's functional capacity is predicated on Plaintiff's subjective testimony that has not been shown to be demonstrably false, his own observations and subjective opinion about her functioning as a long-time treating physician, and objective medical evidence and clinical findings. As such, it cannot be discredited simply because the ALJ doubts Plaintiff's credibility. *Id.*; *see also, Lester*, 81 F.3d at 832-33 (In assigning weight to the treating physician's opinion, that physician's subjective judgment, in addition to his clinical findings and interpretation of test results, must be considered).

---

[4] In an unpublished memorandum decision, the Ninth Circuit explained that its decision in *Ryan v. Commissioner* should not be stretched illogically to require an ALJ, for example, to credit a physician's opinion that is predicated on demonstrably false statements provided to that physician by the claimant which the physician accepted as true. *Calkins v. Astrue*, 384 F.3d App'x 613, 615-16 (9th Cir. 2010). In such a case, the court reasoned, discrediting the doctor's opinion based on the subjective statements of the claimant would be entirely proper, even to the extent the doctor had made his own observations and findings.

**b.    The ALJ's Rejection of Dr. Amsden's Opinion as Inconsistent With the Medical Record as a Whole**

Plaintiff's brief does not address the ALJ's rejection of Dr. Amsden's opinion on the ground that it was inconsistent with the medical evidence as a whole.  The Commissioner argues that the ALJ properly gave less weight to Dr. Amsden's conclusions regarding Plaintiff's limitations because they were inconsistent with the medical records.  Specifically, the ALJ noted that the objective laboratory reports and X-ray results did not support the degree of Plaintiff's limitations as opined by Dr. Amsden.  (AR 17.)

In rejecting the opinion of Dr. Amsden, the ALJ concluded that it is "not consistent with the medical record as a whole.  The objective laboratory reports and X-rays in this matter are not consistent with the extremely reduced level of activity described by the doctor."  (AR 17.)  In and of itself, this is insufficient to constitute a specific and legitimate reason for rejecting the opinion of a treating physician. *Embrey v. Bowen*, 849 F.2d 418, 421-23 (9th Cir. 1988). In *Embrey*, the ALJ's decision set forth the medical evidence and then offered the following conclusion:

> The opinions of total disability tended [sic] in the record are unsupported by sufficient objective findings and contrary to the preponderant conclusions mandated by those objective findings.  The duration of the claimant's stress treadmill testing and relative lack of positive findings, the results of other laboratory and x-ray testing, the objective observations of the physicians of record, all preponderate toward a finding that the claimant has never lost the [RFC] for light work for any period approaching 12 months.

*Id.* at 421.  The court found this discussion of the evidence insufficient: "To say that medical opinions are not supported by sufficient objective findings or are contrary to the preponderant conclusions mandated by the objective findings does not achieve the level of specificity our prior cases have required, even when the objective factors are listed seriatim.  The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct." *Id.* at 421-22.

Here, the September 2007 X-rays and MRIs indicated that Plaintiff had calcific tendinitis in her left shoulder, which Dr. Baker stated would explain the pain she was reporting in that shoulder. (AR 435, 441.)  An X-ray report of Plaintiff's right shoulder showed degeneration of the "AC joint" and calcific tendinitis.  (AR 435, 442.)  MRIs indicated that Plaintiff had developed degenerative

pathology of the lumbar and cervical spine since MRIs were performed in 2004. (AR 436.) An upper extremity electrodiagnostic study indicated essentially normal results, but noted a borderline right median sensory distal latency prolongation. (AR 435, 438.) Thus, the September 2007 reports generally appear to indicate that Plaintiff's conditions, particularly with regard to her shoulders and her back (lumbar spine) and neck (cervical spine), were worsening. Without a discussion of the ALJ's interpretation of the 2007 X-ray and MRI findings and how they undercut Dr. Amsden's March 2008 opinion, discrediting the March 2008 opinion due to inconsistency with objective medical findings lacks specificity and presents only a conclusion that is not conducive to judicial review.

Finally, even assuming that Dr. Amsden's opinion was properly rejected, the ALJ's RFC assessment is not supported by substantial evidence because the September 2007 radiology and MRI reports indicating degenerative changes were not considered by Drs. Nawar and Khong – on whose opinions the ALJ relied. *See Salazar v. Astrue*, 2009 WL 2524874, at * 5 (C.D. Cal. Aug. 17, 2009) (finding that ALJ's reliance on medical expert opinion who failed to review all the relevant records did not constitute substantial evidence); *see also*, 20 C.F.R. §§ 404.1545(a), 416.945(a) (RFC is an assessment based upon all of the relevant evidence). Moreover, the ALJ provided no consideration of how the degenerative findings in the 2007 MRI and radiology reports were consistent with the assessments provided by Drs. Nawar and Khong, particularly with regard to Plaintiff's capacity to stand and walk.

Dr. Amsden's March 2008 opinion is the only medical opinion that addresses Plaintiff's functional capacity with respect to lifting, standing, walking, sitting, reaching, and handling following the acquisition of additional MRI and X-ray reports of Plaintiff's back and shoulders that Dr. Baker found indicated degenerative changes not evidenced in the 2004 MRI and X-ray reports. (AR 436 ("in the interval since testing in 2004, Ms. Vasquez has developed degenerative pathology in the cervical spine and in the lumbar spine").) The reviewing physicians that assessed Plaintiff's functional capacity, whom the ALJ credited, did so without the benefit of the September 2007 MRI and radiology reports. Dr. Khong's disagreement with Dr. Serrano's examining opinion as to the number of hours Plaintiff could stand and walk was predicated on the fact that the 2004 MRI of the lumbar and cervical spine did not show any degenerative changes, and only subjective tenderness

was noted at L5-S1.  Given the September 2007 radiological and MRI reports that indicated degenerative changes in both the cervical and lumbar spines, Dr. Khong's 2006 opinion may not have continuing viability with respect to Plaintiff's capacity for standing and walking.  While Dr. Khong's assessment may constitute substantial evidence as to Plaintiff's functional abilities in 2006, it does not necessarily constitute substantial evidence of her functional abilities after September 2007.  The ALJ should consider Plaintiff's functional capacity and the medical evidence of record in light of the 2007 radiological and MRI reports.

### 3.    Dr. Serrano's Opinion of Plaintiff's Functional Capacity

On December 10, 2006, upon examination of Plaintiff, Dr. Serrano determined that the number of hours Plaintiff could be expected to stand and walk was limited to two hours because of degenerative joint disease in Plaintiff's lumbar spine.  (AR 404.)  This opinion was criticized by Dr. Khong because MRI evidence in 2004 did not indicate degenerative joint disease and, in fact, Dr. Serrano noted that the MRI of the lumbar spine was normal.  (AR 400.)  Further, because Dr. Khong felt there was no objective basis for this opinion, Dr. Khong expressed his view that Dr. Serrano's opinion appeared to be based only on Plaintiff's subjective complaints, rather than objective medical evidence.  The ALJ adopted Dr. Khong's criticisms of Dr. Serrano's opinion as reasons to attribute little weight to Dr. Serrano's opinion.  (AR  16 ("The undersigned agrees with the critique of Dr. Serrano's opinions.  Therefore, Dr. Serrano's opinions are given very little weight herein.").)

Plaintiff contends that the ALJ erred by discrediting Dr. Serrano's opinions on the ground that they were based only on the subjective testimony of Plaintiff.  While the Court agrees with Plaintiff in this regard, the ALJ also adopted Dr. Khong's criticism that Dr. Serrano's opinion about Plaintiff's ability to stand and walk contradicted the actual 2004 MRI findings.  This is a specific and legitimate reason to reject the opinion.  *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004) (ALJ may reject physician's opinion that is conclusory, brief, or unsupported by objective medical findings); *Connett v. Barnhart*, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where physician's treatment notes "provide no basis for the functional restrictions he opined should be imposed on [the claimant]").

It is worth noting that the 2007 MRI findings appear to lend support to Dr. Serrano's opinion. Because of the need to assess the medical evidence in light of these findings, the ALJ may revisit Dr. Serrano's opinion. However, because the September 2007 MRI and radiology reports (AR 441-47) were obtained after Dr. Serrano provided an opinion in 2006 (AR 399-404), that 2006 opinion is stale to the same measure as Dr. Nawar's April 2006 opinion (AR 391-98) and Dr. Khong's March and April 2007 opinions (AR 411-18). Moreover, because Dr. Serrano's opinion appears internally inconsistent with regard to the diagnosis of degenerative joint disease in Plaintiff's lumbar spine in the face of normal MRI results of the lumbar spine, it was appropriate to afford the opinion less weight regarding Plaintiff's functional capacity in 2006. *See Batson*, 359 F.3d at 1195; *Connett*, 340 F.3d at 875.

**B.     Remand Is Required**

The ALJ did not provide specific and legitimate reasons based on substantial evidence in the record to discount the opinions of Dr. Amsden. Generally, "[w]here the Commissioner fails to provide adequate reasons for rejecting the opinion of a treating or examining physician, [the Court credits] that opinion as 'a matter of law.'" *Lester*, 81 F.3d at 830-34 (finding that, if doctors' opinions and plaintiff's testimony were credited as true, plaintiff's condition met a listing (quoting *Hammock v. Bowen*, 879 F.2d 498, 502 (9th Cir. 1989))). Crediting an opinion as a matter of law is appropriate when, taking that opinion as true, the evidence supports a finding of disability. *See Smolen v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).

Courts retain flexibility, however, in applying this crediting-as-true theory. *Connett*, 340 F.3d at 876 (remanding for further determinations where there were insufficient findings as to whether plaintiff's testimony should be credited as true). "In some cases, automatic reversal would bestow a benefits windfall upon an undeserving, able claimant." *Barbato v. Comm'r of Soc. Sec. Admin.*, 923 F. Supp. 1273, 1278 (C.D. Cal. 1996) (remanding for further proceedings where the ALJ made a good-faith error in that some of his stated reasons for rejecting a physician's opinion were legally insufficient).

Here, the ALJ did not neglect to state the reasons for the weight given to the medical opinion of Dr. Amsden. Rather, the ALJ erred because the stated reasons are legally insufficient. "Such

1  good faith errors inevitably will occur.  Reasonable judicial minds sometimes will disagree regarding

2  proper application of the rather imprecise standard of 'specific, legitimate' reasons." *Barbato*,

3  923 F. Supp. at 1278.  "[U]nder the rule in *Lester*, the [medical] opinion will trigger benefits

4  whenever the ALJ's previously stated reasons for rejecting the opinion fall short of the ill-defined

5  'specific, legitimate' standard." *Id.* (footnote omitted).  "A reviewing court should have discretion

6  to avoid this inequitable result by remanding the case for further administrative proceedings.

7  Remand necessitates delay, but the cost of this delay should be balanced against the risk of an

8  erroneous determination." *Id.*; *see also McAllister v. Sullivan*, 888 F.2d 599, 603 (9th Cir. 1989)

9  (remanding for further proceedings because Secretary of Health and Human Services was in better

10 position than court to point to evidence in record to provide specific, legitimate reasons to disregard

11 treating physician's opinion).  Accordingly, the Court exercises its discretion to remand this case to

12 the Commissioner for further proceedings.  *See McAllister*, 888 F.2d at 603 (holding that court may

13 remand to allow ALJ to provide the requisite specific and legitimate reasons for disregarding medical

14 opinions).

15      Because the Court remands this case for renewed consideration of the medical evidence, the

16 Court dispenses with an exhaustive analysis of the ALJ's credibility determination.  In light of the

17 Court's finding that the ALJ failed to properly evaluate the opinions of Dr. Amsden, and because

18 credibility determinations are inescapably linked to conclusions regarding medical evidence,

19 20 C.F.R. § 416.929, the ALJ's credibility finding is also reversed and the issue remanded.  In

20 addition, Plaintiff contends that the ALJ erred in failing to provide specific and germane reasons to

21 discount testimony of a lay witness and the ALJ erred by failing to inquire whether the VE's

22 testimony was consistent with the DOT.  The Court need not consider these arguments in light of

23 the need for reversal on other grounds.  *See Marcia v. Sullivan*, 900 F.2d 172, 177 n.6 (9th Cir. 1990)

24 ("Because we remand for reconsideration of step three, we do not reach the other arguments

25 raised."); *Pendley v. Heckler*, 767 F.2d 1561, 1563 (11th Cir. 1985) (per curiam) ("Because the

26 'misuse of the expert's testimony alone warrants reversal,' we do not consider the appellant's other

27 claims.").

28

## CONCLUSION

Based on the foregoing, the Court finds that the ALJ's decision is not supported by substantial evidence and is, therefore, REVERSED and the case REMANDED to the ALJ for further proceedings consistent with this order.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff Carmen Peres Vasquez and against Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:   March 19, 2012**                          /s/ Sheila K. Oberto
                                                     UNITED STATES MAGISTRATE JUDGE